# WHEELING.

## BISHOFF *v.* HARTLEY.

### July 17, 1876.

1876.
June Term.

1. The defendants levied their attachment on and sold, as the property of Shaw, certain personal property, which had been sold by Shaw, it was claimed, to his brother-in-law, the plaintiff, before the issuing of the attachment. The plaintiff brought his action of trespass, therefor, against them; on the trial the defendants have a right to prove the acts and declarations of Shaw occurring and made a few days before the alleged sale, tending to show a fraudulent purpose of putting his property in the hands of his father out of the reach of his creditors, though the plaintiffs were not present, when such acts were done or declarations made, and had no knowledge thereof.

2. But before the defendants can succeed in having the sale regarded as a nullity, they must satisfy the jury, by the evidence offered by the plaintiff, or by their own evidence, that the grantor Shaw was actuated by a fraudulent purpose, in making the sale to the plaintiff, and that the plaintiff participated in this fraudulent purpose, or had knowledge thereof, when he purchased said property.

*Supersedeas* to, and appeal from, a judgment of the circuit court of Preston county, rendered on April 15, 1874, granted on the defendants below.

The plaintiff below was William H. Bishoff and the defendants, Edgar M. Hartley, Isaac B. Cobun and Jacob Cupp.

The evidence in the bill of exceptions, taken at the trial of the cause, and the other material facts, will be found set forth, sufficiently, in the opinion of the Court.

The Hon. John Brannon, judge of said circuit court, presided at the trial below.

C. W. B. *Allison* for the plaintiff in error.

P. H. *Keck* for the defendants in error.

GREEN, JUDGE :

The appellee, Wm. H. Bishoff, brought his action of trespass, in the circuit court of Preston, in 1871, against the appellants for entering on his farm in that county, and publicly carrying off fourteen head of cattle, twenty-sev-en sheep, five hogs, one horse, and other personal prop-erty, described in the declaration as belonging to him. The defendants plead not guilty and issue was joined, On 'the trial, the defendants took a bill of exceptions, which states that the plaintiff introduced a deed from Smith and wife to C. G. Shaw, for said farm of one hun-dred and thirty-six acres. The deed recites that a form-er deed had been executed for this farm, for $1,533, but that it had been destroyed when the court house of Preston county was burned, and that said court had or-dered, in the suit of Smith v. Bishoff and Shaw, this deed to be made, as a further assurance, before said land should be sold, to pay to Smith the unpaid purchase money, which sale had been ordered by said court. This deed is dated March 8, 1870, and reserves a vendor's lien for $848.28. The plaintiff also introduced a deed with gen-eral warranty, dated and recorded August 6, 1869, from Shaw to the plaintiff, Bishoff, conveying this farm of one hundred and thirty-six acres, in consideration of $620 cash paid in hand : Also an article of agreement between Shaw and Bishoff, dated August 5, 1869, whereby Shaw agrees to sell and convey to Bishoff this one hundred and thirty-six acres of land, and fourteen head of cattle, twen-seven sheep, five hogs, one horse, and other personal property, the same as that described in the declaration, and a few other articles, in consideration of $620 cash in hand paid ; and he agrees to give him full and peace-

able possession thereof, without any encumbrance; and to make him a general warranty deed when the purchase money is paid. Also the deposition of Shaw, who says he sold said land, (or all interest in said land) the greater part of the purchase money being unpaid, to Smith, of whom he had purchased, and that Bishoff agreed to pay to Smith this balance of purchase money; and that at sametime he sold to Bishoff all the personal property, which has been described above. Bishoff was to pay him therefor $620 cash in hand, which was paid by Bishoff. This deposition was taken and sworn to on August 9, 1873, in Kansas. By consent of parties, Bishoff also introduced his answer in said chancery suit, before referred to, sworn to by him October 11, 1869. In this answer he states that he is the brother-in-law of Shaw, and that he purchased this one hundred and thirty-six acres of land of Shaw in good faith, for a full and fair consideration; that on August 5, 1869, Shaw owed him $620, for sheep horses, &c., sold him, and for money loaned him, &c., &c., and that Shaw owned said land and personal property before described; that Shaw came to his house, and told the respondent, Bishoff, that he could not pay his said debt, unless respondent would buy this property. Respondent told him he did not want to buy; Shaw insisted that respondent had better buy and pay the balance of the purchase money due to Smith, on rather easy payments than to lose his money, saying that he was indebted to other persons, and could not pay all. On learning this, respondent concluded to purchase, and it was agreed he should pay the balance of the purchase moneys due to Smith, and release his debts, making in all between $1,400 and $1,500, as the price of the entire property. The contract was reduced to writing, to this effect, except that nothing was said in the writing about said balance of purchase money due Smith, "because they supposed it would be unnecessary, if not improper, to provide for its payment to said Shaw, but that

it would have to be paid to Smith direct, who was then supposed to hold a lien on said land for same, which respondent would be bound to pay, or have said land sold for the same; wherefore no express provision was inserted in said contract with said Shaw for its payment, but that the payment of the same, it was expressly agreed, verbally, should be made by the respondent to Smith and this amount in fact entered into the price. And that the deed, afterwards executed by Shaw to the respondent, was executed under like impressions, and for like purposes of said contract;" that the price was a fair and full price, and that the sale and purchase was *bona fide*, and not made to delay, hinder, or defraud Shaw's creditors. Respondent further says that he would have paid Smith all the purchase money as it fell due, except that I. B. Cobun, representing himself to be a creditor of Shaw, had brought a suit in chancery against respondent and Shaw, in this Court, asking that this sale might be set aside as fraudulent. He denies that Shaw has left the State, but says that, ever since he left Preston county, he has been near Parkersburg, in this State, and he believes this was well known to complainant, Smith, when he brought this suit. He denies, upon his information and belief, that Shaw in making this sale had any purpose to defraud his creditors. He says he does not, personally, know whether the deed from Smith to Shaw was burned, or whether a lien was in fact retained on its face, and he requires proof thereof, though he does admit that he is bound to pay the purchase money, by his verbal contract with Shaw.

After the introduction of this answer, the plaintiff, Bishoff, was cross-examined: He stated that the article of agreement of sale was written by himself; that shortly before this sale, Shaw bought up a drove of horses, and took them to the eastern market, and returned home a few days before the date of this article of agreement; and that a few days after its date, he left for the west, where he now resides; that he had a settlement with

Shaw, at the date of said article, and he fell in his debt $620. He states that he held his note for $665, dated May 26, 1868, subject to a credit of $165, as of date November 30, 1868—another small note of Shaw, on which he was surety, and which he had to pay, and the price of a horse he had sold him. To pay this balance of $620 he bought the personal property at $520, and the other $100 was the estimated value of Shaw's interest in the realty, after paying the purchase money to Smith, which he, Bishoff, was to pay; that possession of the personal property was given to him, and being in his possession on the first day of August, 1869, it was levied on as the property of Shaw by the defendants, under an attachment issued August 16, 1869, against plaintiff's will and with full notice of his claim; and that it was afterwards sold for the benefit of the defendants.

After the plaintiff had closed his evidence, the defendants introduced, as a witness, the defendant Hartley, who stated that he and his co-defendant, who had sold horses to Shaw, went to see him about August 1, 1869, with a view of getting from him their pay for the horses which they had sold him, and proposed to take his fourteen head of cattle on their claims against him. Whereupon the defendants, by their counsel, propounded to the witness the following question : "Did or did not said Shaw, on that occasion, state that he had sold his cattle to his father?" to the answering of which the plaintiff, by his counsel, objected, unless the plaintiff was present when such supposed conversation took place; and the court sustained the objection. The defendants then proposed to prove by the witness, that at the aforesaid interview with Shaw, the latter had said that he had sold his cattle to his father, who was then present, and that the father proposed letting the defendants have said cattle, if they would pay him the money for them; and that this proposition was made in the presence of Shaw, who offered no objection to the same—But such proof being objected to, the court was of opinion, and ruled, that no

conversation between said Shaw and his father, in the absence of the plaintiff, could be given in evidence; but if the plaintiff was present they would be permitted to prove the conversation, to which ruling of the court the defendants excepted.

The jury found a verdict for the plaintiff, and assessed his damages at $581.50, which was $81.50 more than the damages laid in the declaration—which excess the plaintiff released in court.

The defendants moved the court to set aside the verdict of the jury on the ground that the same was contrary to the evidence, which motion the court overruled ; and thereupon the court entered up a judgment against the defendants in favor of the plaintiff, for $500 with interest from the date of the judgment.

The only question involved in this record is, whether the court erred in excluding from the jury the evidence offered by the defendants, as set forth in said bill of exceptions. When the question is, as in this case, the validity of a sale alleged to be fraudulent, more liberality has prevailed with respect to the rules of evidence than upon most other subjects. The party assailing such sale is, in such a case, obliged to establish to the satisfaction of the jury two separate and distinct facts; *first*, that the grantor was actuated by a fraudulent intent, and, *second*, that the grantee participated in the fraud of the grantor, or that he had knowledge of the grantor's fraud.

The *first*, that the grantor was actuated by a fraudulent intention, may be proved by any relevant evidence, appropriate to prove such intention. As a general rule, this fraudulent intention can only be proven circumstantially, that is, by proving a series of facts from which the jury would be justified in inferring that the grantor was actuated by a fraudulent intention. It may be that the grantor has no knowledge of many of these facts from which, taken together, the jury are to infer

14

the fraudulent intention on the fact of the grantor. But his want of knowledge of any particular part is no reason why this fact should not be allowed to be proven to the jury, provided, always, it has a tendency to prove the fraudulent intention on the part of the grantor: Such particular fact or occurrence would have as much tendency to prove the fraudulent intention of the grantor, if the grantee was ignorant of this fact or occurrence as if he had full knowledge thereof. The fraudulent intention, at the time of the sale, is the point to be established. But the facts and occurrences, from which such fraudulent intention at that time may properly be inferred, need not exist or take place at the time of the sale. They may have existed or taken place a considerable time prior to the sale, and yet, satisfactorily, establish a fraudulent intent, at the time of the sale, on the part of the grantor. So the fraudulent intention on the part of the grantor must be an intent to dispose of the particular goods, which were the subject of the sale, claimed to be fraudulent; yet this fraudulent intent with reference to these goods sold, may be inferred from other fraudulent sales or transactions similar to the one assailed, in reference to other goods, occurring about the same time; and it is not necessary that the grantor should have knowledge of these fraudulent sales or transactions, in order to permit them to be shown to the jury, to establish the fraudulent intent on the part of the grantor. His fraudulent intent in this particular sale, which may be the subject of inquiry before the jury, may be shown by proof of conversations or conduct, showing a general purpose to get rid of all his property, fraudulently, with a purpose of injuring his creditors; and whether these conversations or conduct, tending to show this general purpose on the part of the grantor, were known to the grantee before the sale, are immaterial, so long as the inquiry is whether the grantor had a fraudulent intention; and, therefore, the ignorance of them by the grantee can not properly exclude them from the jury. But the

1876.
June Term.,

Bishoff
v.
Hartley.,

facts and conversations, thus proposed to be proven, must have a tendency to prove the fraudulent intent on the part of the grantor; but objections to evidence in such a case on the ground of irrelevancy are not favored, for the effect of circumstantial facts usually depend on their connection. Circumstances, in themselves slight, may by their joint operation, if sustained by moral coincidences, amount to conclusive proof. "Great latitude," says Mr. Starkie, in his Work on Evidence, p. 58, "is justly allowed, by the law, in the reception of indirect circumstantial evidence, the aid of which is constantly required, not merely to remedy the want of direct evidence, but to supply an invaluable protection against imposition."

Experience shows that positive proof of fraudulent acts is not generally to be expected, and hence the liberality shown by the courts in admitting circumstantial evidence. A reference to a few cases will show how far courts have gone in permitting proof of indirect circumstances, with a view to establish a fraudulent intent on the part of a grantor. In *Bridge v. Eggleston*, 14 Mass. 245, it was *held* that it was proper to permit to go to the jury, as evidence, various declarations made by the grantor, running through a period of six months before the sale, and made to different parties, to the effect that he expected to be ruined by his connection with a certain bank as a director, and he thought it best to pay as little on his debts as possible, and to save what he could to live upon. These conversations were not had in the presence of the grantor, nor was it proved that he had any knowledge of them. The Court say, "his, the grantor's, conduct, actions and declarations before such conveyance was made, are proper subjects to lay before the jury to enable them to ascertain whether the conveyance, on his part, was fraudulent. And such evidence does not prejudice the supposed grantee. If he purchased *bona fide*, and for a valuable consideration, without knowledge of such design, his title will not be affected.

1876.
June Term.

Bishoff
v.
Hartley.

There has been much doubt in reference to this species of evidence. It is certain that more laxity or liberality has prevailed with respect to rules of evidence in inquiries concerning the validity of conveyances supposed to be fraudulent, than upon most other subjects, as the creditor, in such a case, is obliged to prove actual fraud in the grantor; and a participation in, or knowledge of, it on the part of the grantee. We think these two branches of the case will admit of the application of evidence to the two parties, which, although apparently inconsistent with, is by no means repugnant to, the common rules of evidence. To prove fraud in the grantor, his conduct and his declarations before the conveyance may be the best, and, often the only, evidence, within the power of the creditor. He is not at that time interested, nor can it be his design to injure those with whom he may afterwards contract. If fraud is thus proved upon him, then knowledge of it on the part of the grantee is to be proved; which may be done by showing a trifling consideration or none at all; by acts inconsistent with the *bona fide* ownership of the property; by confessions of the nature of his bargain, or other circumstances tending to show knowledge of the designs of the grantor. Without this latter evidence, the former, as to the designs of the grantor, is wholly ineffectual to defeat the purchase, and a jury, under the direction of a court, will always be able to discriminate; so that the purchaser will not be injured by the declarations of the grantor, unless he be proved to have been privy to his fraudulent designs." In the case of *Hall v. Naylor*, 18 N. Y., 588, the Court of Appeals *held*, when the question was whether a vendee of goods procured the sale of them through fraud, evidence ought to be permitted to go to the jury of purchases made by him of others about the same time, involving similar frauds. Comstock, Judge, delivering the opinion of the court, says: "On the trial of the issue the *quo animo* of the transaction is the fact to be arrived at; and it is, therefore, competent to show

that the party accused was engaged in other similar frauds at or about the same time. The transactions must be so connected in point of time, and so similar in their other relations, that the same motive may reasonably be imputed to them all, *Cary v. Hotailing*, 1 Hill 311. It is not necessary that the means of accomplishing each fraud shall be the same." In the case of *Rowley v. Bigelow*, 12 Pick 307, the court *held* that, on the trial of a suit by a vendor of goods, against a purchaser from a vendee, based upon the ground that the goods had been purchased of the plaintiff fraudulently, it was proper to admit, as evidence, the depositions of merchants who had sold goods to the same vendee about the same time, showing that he was then insolvent, and that he knew it, and that he had no reasonable expectation of paying for the goods purchased. This evidence, the court say, bears upon the question of *quo animo*, the intent, the fraudulent purpose. In *Castle et al .v. Bullard*, 23 How. 187, the Supreme Court of the United States say, that, among other circumstantial evidence which should have been permitted to go to the jury on the question, whether the defendants had fraudulently sold plaintiff's goods, was testimony tending to show that the defendants had represented to other persons, about the same time, that the purchaser of the goods in question was in good standing, and had assisted him with gaining credit with other merchants. The Court say: "Much of the evidence was of a circumstantial character, and it is not going too far to say that some of the circumstances adduced, if taken separately, might well have been excluded. Actions of this description, however, where fraud is the essence of the charge, necessarily give rise to a wide range of investigation, for the reason that the intent of the defendant is more or less involved in the issue. No one of the exceptions to the evidence can be sustained."

Applying these principles to the case before us, the *first* inquiry is, did the evidence, which the Circuit Court rejected, tend to show a purpose on the part of the

grantor, Shaw, to delay, hinder, and defraud his creditors? If he entertained this general purpose, upon the principles we have laid down, this is proper evidence to go to the jury, as tending to show such a purpose on his part, in the particular sale he made to the plaintiff. The plaintiff, in his evidence as set forth in the bill of exceptions, shows that Shaw, being insolvent, had purchased a drove of horses, and taken them east, and sold them a few days before, and a few days afterwards, having parted with all his property, he went west; that upon his return from the east, he sold all his property, real and personal, to his brother-in-law, as he states, for debt which he alleged he owed to him; that this property was worth some $1,400 or $1,500, at least, and that he warranted the title of all the property, real and personal, so far as the written contract and deed, show, though the plaintiff and Shaw, in effect, say that he sold only his interest in the real estate—the plaintiff undertaking, verbally, to pay a lien on it of some $850; that the debt, which the plaintiff and Shaw say was surrendered as the consideration of this conveyance, was $620—a grossly inadequate price, if we are to be governed by the written contract and deed in ascertaining what was sold; but probably a reasonable price, if we are to be governed by the testimony of the parties as to what was the verbal understanding of what was sold. The defendants, by the evidence rejected by the Circuit Court, offered to prove that a few days before the alleged sale by Shaw to his brother-in-law, the plaintiff, he had put all his cattle into the possession of his father under what must be regarded as a pretended sale, as he sold them a few days after, as he says, to his brother-in-law; and that his father, in his presence, and with his apparent approbation, offered to sell them. This evidence certainly tends to show a general fraudulent purpose on the part of Shaw, who was then insolvent, to put his property out of the reach of his creditors, and it ought, therefore, to have been admitted, as tending to

show the same purpose on his part when he made the alleged sale of the same cattle, and other property, to his brother-in-law, a few days afterwards. It ought to be admitted for that purpose, though the plaintiff, his brother-in-law, was not present, and never knew anything about this pretended sale to the father. It is true that the brother-in-law knew nothing of this pretended sale; it has no tendency to show that he participated with Shaw in this fraudulent purpose; and before his sale can be treated as a nullity, the defendants must satisfy the jury, by such evidence as has been offered by the plaintiff, or as may be offered by the defendant, that he did participate in a fraudulent purpose of Shaw, in making the particular sale to him; or, at least, had knowledge of such fraudulent purpose on August 5, 1869, when he made the purchase.

We are, therefore, of the opinion that [the Circuit Court erred when it rejected the testimony offered by the defendants, and that the judgment entered by the Circuit Court on the fifteenth day of April, 1874, in favor of the plaintiff, Wm. H. Bishoff, against the defendants Isaac B. Cobun, Edgar M. Hartley, and Jacob Cupp, must be reversed and annulled, and that the plaintiffs in error, recover against the defendants in error, their costs here in this Court expended, in and about the prosecution of this cause. And this Court, proceeding to render such judgment as the said circuit court ought to have rendered, it is considered, that the verdict of the jury rendered in this case, in the said circuit court, be set aside, and a new trial of the case be granted, the costs of the former trial to abide the event of the suit, and this cause is remanded to the said circuit court of Preston county, for further proceedings therein, there to be had according to law.

The other Judges concurred.

JUDGMENT REVERSED, VERDICT SET ASIDE, NEW TRIAL AWARDED, AND CAUSE REMANDED.